GTE MOBILNET OF OHIO; Ohio RSA # 3; GTE Mobilnet Incorporated, Plaintiffs–Appellees/Cross–Appellants (96–3025),

New Par; Northern Ohio Cellular Telephone Company; Akron Cellular Telephone Company; Canton Cellular Telephone Company; Columbus Cellular Telephone Company; Lorain/Elyria Cellular Telephone Company; Cellular Communications of Mansfield; Airtouch Cellular of Ohio, formerly known as Pactel Cellular of Ohio; Cellular Communications Incorporated, Plaintiffs–Appellees,

v.

David W. JOHNSON; Ronda Hartman Fergus; Richard M. Fanelly; Jolyn Barry Butler, Commissioners, Public Utilities Commission of Ohio, Defendants–Appellants/Cross–Appellees (95–4359),

Westside Cellular, Inc., doing business as Cellnet, Intervenor–Appellant/ Cross–Appellee (95–4358).

Nos. 95–4358, 95–4359 and 96–3025.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1996.

Decided April 18, 1997.

Rehearings and Suggestions for Rehearings En Banc Denied May 28, 1997.

Parks, Columbus, OH, for Westside Cellular, Inc. in Nos. 95–4358 and 96–3025.

James B. Ramsay, briefed, Nat. Ass'n of Regulatory Utility Com'rs, Washington, DC, for amicus curiae Nat. Ass'n of Regulatory Utility Com'rs in Nos. 95–4358, 95–4359 and 96–3025.

W. Ashby Beal, Jr., briefed, Douglas L. Povich, briefed, Kelly & Povich, Washington, DC, for amicus curiae Nat. Wireless Resellers Ass'n in No. 95–4358, 95–4359 and 96–3025.

James B. Niehaus, argued, Thompson, Hine & Flory, Cleveland, OH, Kathleen M. Trafford, argued and briefed, Porter, Wright, Morris & Arthur, Columbus, OH, Thomas E. Lodge, Douglas L. Hertlein, Thompson, Hine & Flory, Columbus, OH, for GTE Mobilnet of Ohio, Ohio RSA #3, GTE Mobilnet Inc. in No. 95–4359.

Samuel H. Porter, Kathleen M. Trafford, Porter, Wright, Morris & Arthur, Columbus, OH, for New Par, Northern Ohio Cellular Telephone Co., Akron Cellular Telephone Co., Canton Cellular Telephone Co., Columbus Cellular Telephone Co., Lorain/Elyria Cellular Telephone Co., Cellular Communications of Mansfield, Airtouch Cellular of Ohio, Cellular Communications Inc. in No. 95–4359.

Ann E. Henkeneer, briefed, Steven T. Nourse, argued and briefed, Office of Atty. Gen., Public Utilities Section, Columbus, OH, for David W. Johnson, Ronda Hartman Fergus, Richard M. Fanelly, Jolyn Barry Butler in No. 95–4359.

Randy J. Hart, briefed, Hahn, Loeser & Parks, Cleveland, OH, Maureen R. Grady, Hahn, Loeser and Parks, Columbus, OH, for Westside Cellular, Inc. in No. 95–4359.

James B. Niehaus, argued and briefed, Thompson, Hine & Flory, Cleveland, OH, Thomas E. Lodge, briefed, Douglas L. Hertlein, Thompson, Hine & Flory, Columbus, OH, for GTE Mobilnet of Ohio, Ohio RSA #3, GTE Mobilnet Inc. in No. 96–3025.

Steven T. Nourse, briefed, Ann E. Henkener, briefed, Office of Atty. Gen., Public Utilities Section, Columbus, OH, for David W. Johnson, Ronda Hartman Fergus, Rich-

James B. Niehaus, argued, Thompson, Hine & Flory, Cleveland, OH, Alaine Y. Miller, Kathleen M. Trafford, argued and briefed, Porter, Wright, Morris & Arthur, Columbus, OH, Thomas E. Lodge, Douglas L. Hertlein, Thompson, Hine & Flory, Columbus, OH, for GTE Mobilnet of Ohio, Ohio RSA #3, GTE Mobilnet Inc. in No. 95–4358.

Alaine Y. Miller, Samuel H. Porter, Kathleen M. Trafford, Porter, Wright, Morris & Arthur, Columbus, OH, for New Par, Northern Ohio Cellular Telephone Co., Akron Cellular Telephone Co., Canton Cellular Telephone Co., Columbus Cellular Telephone Co., Lorain/Elyria Celluar Telephone Co., Cellular Communications of Mansfield, Airtouch Cellular of Ohio, Cellular Communications Inc. in No. 95–4358.

Randy J. Hart, briefed, Hahn, Loeser & Parks, Cleveland, OH, Maureen R. Grady, Janine L. Migden, argued, Hahn, Loeser and

ard M. Fanelly, Jolyn Barry Butler in No. 96–3025.

Before: SUHRHEINRICH, DAUGHTREY, and GIBSON, Circuit Judges.[*]

JOHN R. GIBSON, Circuit Judge.

The Commissioners of the Public Utilities Commission of Ohio [1] and Westside Cellular, Inc., which does business as Cellnet, appeal a preliminary injunction prohibiting the Commission from exercising jurisdiction over the aspects of Cellnet's complaint alleging that GTE Mobilnet and the New Par Companies engaged in discriminatory and anti-competitive conduct. The injunction also prohibited the Commission from attempting, in any other way, to exercise control over the cellular rates charged by GTE Mobilnet and the New Par Companies. The district court ruled that 47 U.S.C. § 332(c)(3)(A) (1994) expressly preempted the Commission from considering Cellnet's complaint because Cellnet sought relief requiring the Commission to regulate rates, but the district court allowed the Commission to retain jurisdiction over issues involving the bundling of services and products. The Commission and Cellnet argue that the district court erred both in concluding that federal law preempted their claims, and in failing to abstain from considering the issues before the Commission. GTE Mobilnet cross-appeals, arguing that the district court misunderstood the meaning of the term "bundling" and that Ohio law does not permit the Commission to regulate bundling. We affirm the district court's decision with respect to the cross-appeal, and reverse in all other respects, concluding that under *Youn-*

*ger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the district court was required to abstain, and direct the district court to dissolve the injunction against the Commission in order to allow the Commission to resolve the preemption issue.

GTE Mobilnet [2] and the New Par Companies [3] ("New Par") operate cellular telephone networks and sell cellular telephone services. These cellular service providers are "telephone companies" and "public utilities" for purposes of applicable provisions of Ohio Utility Law, Ohio Revised Code Title 49. In addition, the cellular telephone service provided by GTE Mobilnet and New Par is a "commercial mobile service" under the Federal Communications Act, as amended in 1993 by the Omnibus Budget Reconciliation Act of 1993, which subjects these companies to treatment as "common carriers" and submits them to the jurisdiction of the Federal Communications Commission pursuant to 47 U.S.C. § 332(c)(1)(A). Cellnet is a wholesale customer of New Par and resells cellular telephone services to end-users, the customers who actually use the services.

Cellnet filed a complaint before the Ohio Commission against GTE Mobilnet and New Par [4] alleging several violations of Ohio law and the Commission's several orders concerning practices by cellular telephone service providers. The preemption arguments before us require a detailed discussion of Cellnet's complaint.

In its complaint Cellnet alleged that GTE Mobilnet and New Par: (1) did not maintain separate wholesale and retail operations or accounting records, but instead kept interre-

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The Commissioners include: David W. Johnson, Ronda Hartman Fergus, Richard M. Fanelly, and Jolyn Barry Butler.

2. GTE Mobilnet of Ohio Limited Partnership, Ohio RSA # 3, and GTE Mobilnet Inc. collectively are referred to as GTE Mobilnet.

3. New Par, Northern Ohio Cellular Telephone Company, Akron Cellular Telephone Company,

Canton Cellular Telephone Company, Columbus Cellular Telephone Company, Lorain/Elyria Cellular Telephone Company, Cellular Communications of Mansfield, Airtouch Cellular of Ohio, formerly known as Pactel Cellular of Ohio, Inc. and Cellular Communications, Inc. are collectively known as New Par. These companies do business in Ohio under the trade name CellularOne.

4. Cellnet also named as parties companies that do not appeal: Ameritech Mobile Communications, Inc., Youngstown Cellular Telephone Company, and Cellular Communications, Inc.

lated records;[5] (2) refused to provide cellular service to Cellnet at the same rates, charges, and conditions under which each provided service to their retail functions, and instead charged Cellnet at a higher rate;[6] (3) provided affiliated resellers, but not Cellnet, with a number of non-monetary benefits that substantially reduced the cost of service to the affiliated resellers, which was unfair and unreasonable to Cellnet;[7] (4) cross-subsidized their retail operations, which they failed to keep separate from their wholesale operations, with profits generated by their wholesale functions, which enabled their retail operations to provide service to the public at lower than actual cost with the purpose of destroying competition;[8] (5) offered retail rate plans which charged rates below those contained in their tariffs, and below the rates made available to Cellnet;[9] (6) had entered into agreements concerning roaming[10] among themselves that were discriminatory pricing schemes that disadvantaged Cellnet and resulted in a loss of revenue to it.[11]

Finally, Cellnet complained that these alleged actions had placed it at a disadvantage in the marketplace and had prevented it from competing in a number of markets served by GTE Mobilnet and New Par. Cellnet claimed that the discriminatory treatment had caused it to lose money, which slowed down its entrance into certain markets. Under GTE Mobilnet's practice of charging Cellnet more than the amount charged to GTE Mobilnet's and New Par's affiliated resellers, Cellnet had suffered and continued to suffer severe economic damage.

Cellnet asked the Commission to find that GTE Mobilnet and New Par had violated Commission orders and Ohio law, and therefore order GTE Mobilnet and New Par: (1) to separate their wholesale and retail functions; (2) to maintain separate accounting records for those operations; (3) to stop cross-subsidizing the retail operations with wholesale profits; (4) to provide service to Cellnet at the rates, terms, and conditions that they provide to their own affiliated retail functions; (5) to submit annual audits to verify their compliance; and (6) to compensate Cellnet for damages suffered by Cellnet as a result of these violations.

After filing the complaint, Cellnet attempted to obtain discovery from GTE Mobilnet and New Par. GTE Mobilnet and New Par, however, moved for dismissal, arguing that federal law preempted the Commission's authority to hear the case. The Commission denied their motion to dismiss.

GTE Mobilnet and New Par filed this action for injunctive relief in federal district court, arguing that the relief Cellnet sought would require the Commission to regulate rates and, therefore, that 47 U.S.C. § 332(c)(3)(A) facially preempted Cellnet's claims and thus preempted the Commission's authority to hear the case.

The district court granted a preliminary injunction on the grounds that GTE Mobilnet and New Par had established a likelihood of success on the merits of the preemption claim and that the parties had also satisfied the other elements required for the grant of a preliminary injunction.

---

5. This allegedly violated a Commission order and Ohio Revised Code section 4905.54.

6. This allegedly violated a Commission order and Ohio Revised Code sections 4905.22, 4905.33, and 4905.35.

7. This allegedly violated a Commission order and Ohio Revised Code sections 4905.22, 4905.33, and 4905.35.

8. This allegedly violated Ohio Revised Code sections 4905.22, 4905.33, and 4905.35.

9. This allegedly violated a Commission order and Ohio Revised Code sections 4905.33, 4905.35, and 4905.54.

10. A cellular telephone user roams when he or she travels out of the area served by his or her carrier.

11. This allegedly violated Commission orders and Ohio Revised Code sections 4905.22, 4905.33, 4905.35, and 4905.54. In addition, Cellnet contended that Northern Ohio Cellular Telephone and Youngstown Cellular Telephone Company had increased their roaming rates without filing for an increase as required by Ohio Revised Code section 4909.18.

The terms of 47 U.S.C. § 332(c)(3)(A) were central to the district court's consideration of the preemption issue and also to ours.[12] This section was passed in 1993, amending the Federal Communications Act to preempt state authority to "regulate the entry of or the rates charged" by commercial mobile services. The statute, however, allows states to continue "regulating the other terms and conditions" of commercial mobile services. Subsection (i) of the statute provides that states can petition the FCC for permission to re-regulate rates where market conditions fail to protect subscribers adequately from unjust or unreasonably discriminatory rates. At issue in the case before us is whether the relief Cellnet requested required the Commission to regulate the rates charged. If so, section 332 would preempt the Commission's authority to adjudicate the complaint.

In considering the statute, the district court looked to the statute on its face and then turned to the legislative history, and concluded that section 332 did not preempt the Commission from considering bundling claims. The court observed, however, that most of Cellnet's complaint did not involve bundling claims; and then considered the rest of Cellnet's complaint.

Cellnet and the Commission argued that requiring GTE Mobilnet and New Par to charge affiliated and unaffiliated resellers the same price was not a form of rate-setting, but instead a type of action over which the Commission had jurisdiction. The district court rejected this argument, reasoning that if Congress had intended automatically to reserve to the states the authority to control discriminatory rates, Congress would not have included in the statute subsection (i), which allowed a state to petition for authority to re-regulate rates when the rates are unreasonably discriminatory. The court concluded, therefore, that the plain language of

the statute reflected Congress's clear intent to preempt the states from controlling discriminatory rates. The FCC had not granted the Commission the authority to re-regulate discriminatory rates under subsection (i), therefore the district court held that section 332 preempted the Commission from considering Cellnet's complaint. Thus, GTE Mobilnet and New Par had demonstrated a substantial likelihood of success on the merits of their preemption claim.

After discussing issues of retroactivity, ripeness, and whether the statute created a private right of action, issues we need not consider because they are not relevant to our reasoning, the district court turned to the Commission's and Cellnet's abstention arguments. The court determined that abstention under neither *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), nor under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), applied to this case because section 332(c)(3)(A) "unequivocally preempt[ed]" the state's authority to regulate cellular rates.

On appeal, Cellnet and the Commission argue that the district court erred in numerous respects. The most significant argument, however, is that the district court should have abstained under *Younger* and *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). GTE Mobilnet and New Par contend that the district court properly issued the preliminary injunction, and properly declined to abstain because the federal statute facially preempts state law. GTE Mobilnet cross-appeals, arguing that the district court erred in determining that the Commission may exercise jurisdiction over Cellnet's claims relating to the bundling of services and equipment.

## I.

■ We review de novo questions of law relevant to a district court's grant of a pre-

---

12. Section 332(c)(3)(A) states in part:

[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.... Notwithstanding the first sentence of this subparagraph, a State may petition the [Federal Communications]

Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory;....

liminary injunction. *See Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). Questions of federal preemption of state law generally are considered questions of law subject to de novo review. *See Michigan Consol. Gas Co. v. Panhandle Eastern Pipe Line Co.,* 887 F.2d 1295, 1299 (6th Cir.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990).

The district court's injunction based upon preemption brings us directly to the interplay between preemption and abstention that we have articulated in a number of our decisions. In *CSXT, Inc. v. Pitz,* 883 F.2d 468, 472–74 (6th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990), and *Federal Express Corp. v. Tennessee Public Service Commission,* 925 F.2d 962, 967–68 (6th Cir.), *cert. denied,* 502 U.S. 812, 112 S.Ct. 59, 116 L.Ed.2d 35 (1991), we held that when state and federal courts have concurrent jurisdiction to decide preemption questions, a federal court should abstain to allow the state court to consider the preemption issues. We added a proviso to the rule, however, in *Bunning v. Commonwealth of Kentucky,* 42 F.3d 1008, 1011 (6th Cir.1994), and *Norfolk & Western Railway Co. v. Public Utilities Commission,* 926 F.2d 567, 573 (6th Cir.1991), when we held that if the issues present facially conclusive claims of federal preemption, we will not abstain, but instead will decide the preemption question.

It is the application of these four decisions that controls whether the district court erred in its resolution of the preemption issue in light of the abstention arguments. In consideration of whether we should abstain, therefore, our analyses must center on whether the issues before us present facially conclusive claims of federal preemption.

### A.

■ In *Younger* the Supreme Court determined that federal courts should not enjoin pending state criminal proceedings started before the filing of a federal suit, except in the unusual situation where an injunction is necessary to prevent immediate and irreparable injury. 401 U.S. at 43–54, 91 S.Ct. at 750–55. The policies behind *Younger* include

the notion of comity, in which courts consider the interests of both state and federal governments. Before deciding whether federal law preempts state law, a federal court must consider carefully whether it should abstain to allow the state court to resolve the pre-emption question.

In *CSXT,* a federal district court restrained a state agency from enforcing a state rule requiring railroads to furnish toilets in locomotives, because the court concluded that two federal acts preempted the state agency from enforcing the rule. 883 F.2d at 470. The state agency appealed on abstention grounds. *Id.*

On appeal, we held that the fact that this was a preemption case, rather than another type of federal question case, should not modify the manner in which we consider the appropriateness of abstention. *Id.* at 471. We looked at both of the federal acts at issue, and decided that neither act prohibited concurrent state regulation. *Id.* Because there was no grant of exclusive jurisdiction to the federal courts to resolve federal railroad safety questions or preemption claims in the area of railroad safety, we determined that state courts did not lack jurisdiction over questions of railroad safety or preemption claims. *Id.* at 472. "State courts normally have concurrent jurisdiction of federal issues unless such jurisdiction is withdrawn by federal statute." *Id.* We concluded that a federal court need only consider two questions: "whether the state court has concurrent judicial jurisdiction to decide the preemption question and, if the answer to that question is 'Yes,' whether a federal court should abstain in favor of ongoing state proceedings originating in the state regulatory agency." *Id.* at 473–74. Having concluded that the state court had concurrent jurisdiction, we then moved on to consider *Younger* abstention and held that it was appropriate. *Id.* at 474–75.

In *Federal Express,* we followed *CSXT* closely. In *Federal Express,* an ALJ determined that FedEx was a motor carrier under Tennessee law, and required FedEx to comply with Tennessee law. 925 F.2d at 964. A federal district court dismissed on abstention

grounds FedEx's action seeking declaratory and injunctive relief, rejecting FedEx's argument that federal law preempted Tennessee law. *Id.* at 964–65. FedEx appealed, arguing that abstention was inappropriate here because the federal act "absolutely prohibit[ed]" state regulation. *Id.* at 967. FedEx attempted to distinguish *CSXT* because here preemption was "clear", whereas in *CSXT*, there was no clear resolution of the preemption question. *Id.* at 968. We determined that FedEx had failed to distinguish *CSXT*, and because the federal act did not suggest that federal courts had exclusive jurisdiction to resolve the preemption question, we held that Tennessee courts had concurrent jurisdiction to consider the preemption question. *Id.* We then considered whether we should abstain under the *Younger* doctrine, and we held that we should. *Id.* at 968–70.

GTE Mobilnet and New Par argue, however, that under *Bunning* and *Norfolk*, it is not necessary for this court to consider whether to abstain because the federal statute facially preempts state law.

In *Bunning*, Congressman James Bunning conducted a poll, financed by a federal political committee, related to his recent election. The chairman of Kentucky's Democratic Party filed a complaint before the Kentucky Registry of Election Finance against Bunning, alleging that he had used the poll to assess his potential as a future gubernatorial candidate in violation of Kentucky's campaign finance laws. *Bunning*, 42 F.3d at 1009. Thereafter a federal district court held that the Federal Election Campaign Act preempted state law and enjoined the Registry from taking further action on the complaint against Bunning. *Id.*

The Registry appealed on abstention grounds. *Id.* at 1011. We observed that the federal act included an express preemption clause which stated that the Act or rules prescribed under it "supersede and preempt any provision of State law with respect to election to Federal office." *Id.* at 1012 (quotations omitted). We next determined that an interpretive regulation, promulgated pursuant to the federal law at issue, specified that federal law superseded state law concerning the expenditures by political commit-

tees. *Id.* We concluded that because it was undisputed that a federal political committee paid for the poll, the federal law and interpretive regulation clearly preempted the state law. *Id.* at 1011–12. We therefore affirmed the district court's holding that it was not required to abstain because the case presented facially conclusive claims of federal preemption. *Id.*

In *Norfolk*, a state agency appealed a district court decision enjoining it from enforcing an Ohio rule requiring a railroad to maintain a walkway on its railroad bridges because a federal statute preempted the Ohio rule. 926 F.2d at 569. On appeal, we considered whether the federal statute, which excluded states from legislating in any area of railroad safety already "covered" by regulations adopted by the Secretary preempted Ohio's rule. *Id.* at 570. Until the Secretary adopted a rule covering a certain subject matter, however, states could continue regulating within that subject matter. *Id.* Here, however, the Secretary had considered and rejected a bridge walkway rule. We therefore concluded that the federal statute negatively preempted Ohio's rule because the Secretary had covered the subject matter. *Id.* at 570–71.

In considering the agency's abstention arguments, we emphasized that abstention was "not required when the naked question, uncomplicated by ambiguous language, is whether the state law on its face is preempted." *Id.* at 573. In addition, we observed that "facially conclusive" claims of federal preemption may be sufficient to support federal jurisdiction where *Younger* abstention may be otherwise appropriate. *Id.* We concluded, "Because this case present[ed] a facially conclusive challenge to [the Ohio] rule and does not involve interpreting state law or making findings on disputed facts, the considerations that require abstention are not present." *Id.*

## B.

The central question before us today is whether section 332 presents a facially conclusive challenge to the Commission's authority to adjudicate Cellnet's complaint. If so,

we need not abstain. If the preemption claim is not facially conclusive, however, we should consider abstaining to allow the Commission to resolve the preemption issue.

### 1.

▇▇▇ We interpret a statute as a whole to determine whether it presents a facially conclusive preemption claim to Cellnet's action. *See Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357–58, 93 L.Ed.2d 216 (1986). Significantly, the district court paid little heed to the provisions of Ohio law and whether the state law at issue fell within the federal sphere of rate regulation. Where the scope of preemption is at issue, a court must consider whether the state law falls within the area of federal preemption. *See Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 306–10, 108 S.Ct. 1145, 1153–56, 99 L.Ed.2d 316 (1988).

On its face, the preemptive reach of section 332 is limited. The statute preempts states from regulating market entry and rates charged, but specifically allows states to regulate "other terms and conditions" of service. The House report provides a list of examples of matters that fall within the phrase "other terms and conditions," but specifies that the list is "illustrative only and not meant to preclude other matters as fall within a state's lawful authority." H.R.Rep. No. 103–111, at 261 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 588. Thus our inquiry must focus on whether Cellnet's complaint requires the Commission to regulate market entry or rates charged, or whether it falls into the sphere of "other terms and conditions."

Cellnet's complaint alleges several violations of Ohio law and Commission orders, that together are intended to ensure that the services provided by cellular carriers operate in a fair and nondiscriminatory manner. The laws allegedly violated include the following: section 4905.22, which provides that public utilities shall not assess unjust, unreasonable, or unfair charges; section 4905.26, which provides for a hearing when a complaint is filed against any public utility alleging that the utility's charges are unjust and unreason-

able; section 4905.33, which prohibits utilities from charging any person or corporation a greater or lesser charge than it charges another person or corporation for a like service, and from providing service at less than actual cost for the purpose of destroying competition; section 4905.35, which prohibits a public utility from giving any undue or unreasonable advantage or disadvantage to any person or corporation; section 4905.54, which mandates that every public utility shall comply with Commission orders and regulations; and section 4909.18, which requires public utilities desiring to establish or change any charges to file an application with the Commission.

Under these laws Cellnet made allegations in its complaint which we have outlined above in detail. *See supra* at 472–74. In substance, Cellnet alleged that GTE Mobilnet and New Par did not keep their wholesale and retail operations separate; refused to charge Cellnet at the same rates and conditions that they charged their retail functions, instead charging Cellnet more; provided non-monetary benefits to affiliated resellers that were not offered to Cellnet; cross-subsidized their retail operations with profits from their wholesale functions; offered corporate plans which charged rates below those contained in their tariffs and below the rates made available to Cellnet; and violated state laws concerning roaming charges.

The complaint attacked the preferential manner in which GTE Mobilnet and New Par treated their retail affiliates, compared to the way they treated Cellnet, an unaffiliated company.[13] Cellnet argues that Ohio law is indifferent to the amount a cellular service provider charges for its services, but is concerned about the methods in which the services are provided because Ohio law prohibits discriminatory or anti-competitive methods and means of providing services. Under Ohio law, it makes no difference if the rate charged is two cents a minute or twenty dollars a minute, as long as affiliated resellers are charged at the same rates as unaffiliated resellers. Because Cellnet does not care what rate it is charged, but only that it

---

**13.** For example, the complaint alleges that rate plans are made available to affiliated and unaffil-

iated resellers in a discriminatory manner that violates the Ohio Code.

is charged at the same rate, terms, and conditions that affiliated resellers are charged, Cellnet argues that its complaint does not ask the Commission to regulate rates, but only to prohibit discriminatory conduct that violates Ohio law. GTE Mobilnet and New Par answer that, though the relief sought by Cellnet will not require the Commission to set rates, it unquestionably will result in the Commission regulating rates charged.

█ We cannot conclusively determine whether the language of section 332 refers to simply setting rates or whether it refers to any type of adjustment to rates, no matter how indirect. We cannot therefore conclude, as in *Norfolk* and *Bunning,* that the federal law presents "facially conclusive" claims of preemption of the Ohio law at issue. *See Norfolk,* 926 F.2d at 573. In fact, to decide this preemption issue would require us to enter into a detailed analysis of state law, a task in which we will not engage. *See id.* We thus conclude that the state law Cellnet alleges GTE Mobilnet and New Par violated does not fall within the area facially preempted by section 332.

*Total T.V. v. Palmer Communications, Inc.,* 69 F.3d 298 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1459, 134 L.Ed.2d 576 (1996), a case dealing with statutes similar to both the federal statute and the Ohio provisions at issue, supports our conclusion that section 332 does not present a facially conclusive challenge preempting the Commission from adjudicating Cellnet's complaint. In *Total T.V.,* the Ninth Circuit held that a federal statute expressly preempting state regulation of cable television rates did not prevent a cable television operator from bringing an action in state court, alleging that a competitor was engaging in below-cost predatory pricing with intent to destroy competition. *Id.* at 301. The court reasoned that the state law was not preempted because the California statute at issue in *Total TV* only prohibited below cost pricing for anti-competitive reasons and did not directly regulate rates. So long as competitors did not act with discriminatory purpose, they could charge any rate they pleased. *Id.* at 301–02. Likewise, Cellnet

argues its complaint is directed at GTE Mobilnet's and New Par's discriminatory and anti-competitive conduct and not at the actual rates charged. *See also Cable Tel. Ass'n, Inc. v. Finneran,* 954 F.2d 91 (2d Cir.1992) (state law restricting cable companies from imposing charges when a customer wants to downgrade his or her cable service to a less expensive cable package not preempted by federal law that prohibited states from regulating rates charged by cable companies).

In sum, we cannot conclude that section 332 presents a facially conclusive challenge to preempt the Commission from adjudicating Cellnet's complaint.

### 2.

The district court held that the plain language of section 332(c)(3)(A) itself establishes that the measures Cellnet asked the Commission to take were rate regulation and that therefore section 332 preempted the Commission from proceeding with the complaint.

The district court reasoned that Congress would not specifically have provided in subsection (i) that a state could petition for authority to re-regulate unreasonably discriminatory rates unless Congress considered remedying discriminatory rates otherwise to be preempted. Accordingly, the district court determined that subsection (i) "ma[d]e sense" only if section 332 "unequivocally preempt[ed]" the regulation of discriminatory rates. The court concluded that this case involved facial preemption and therefore held that neither *Younger* nor *Burford* abstention applied.

Congress has preempted the state's authority to regulate rates charged by cellular telephone services. Section 332(c)(3)(A) explicitly states: "[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service...." This preemption of state authority, however, is limited by the remaining language of the section:

> [T]his paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.... Notwithstanding the first sentence of this

subparagraph, a State may petition the [Federal Communications] Commission for authority to regulate the rates for any commercial mobile service and the [Federal Communications] Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory, . . . .

■ In interpreting statutes, courts must not be guided by a single sentence or portion of a sentence, but must look to the provisions of the whole law, and to its object and policy. *See Kelly,* 479 U.S. at 43, 107 S.Ct. at 357–58. We are convinced that the district court reached its conclusion on the preemptive effect of subsection (i) on a reading of only a portion of the statutory language, instead of reading the language in context, thus violating *Kelly* 's instruction on statutory interpretation.

Subsection (i) allows the FCC to grant a state the authority to re-regulate rates only where the state shows that the market conditions fail to protect a subscriber from unjust and unreasonable rates, or rates that are unjustly and unreasonably discriminatory. Reading this language in context, subsection (i) seems to require, as a prerequisite to gaining authority to re-regulate rates, a widespread breakdown of the competitive market as manifested in general market conditions of unreasonable or unduly discriminatory rates in the state. This broad-based showing required to gain authority to re-regulate rates does not compel the conclusion that the district court reached that states may no longer adjudicate individual cases involving specific allegations of anti-competitive or discriminatory misconduct. Cellnet's complaint alleges that GTE Mobilnet's and New Par's particular conduct violates Ohio statutes and Commission orders because it is unreasonably discriminatory to Cellnet in its position as a reseller, but Cellnet does not allege anything about generalized market conditions that fail to protect subscribers from unjust or discriminatory rates.

FCC regulations interpreting subsection (i) support our reading of this provision. These regulations provide examples of the kind of evidence that would show that market conditions do not adequately protect subscribers. *See* 47 C.F.R. § 20.13(a)(2) (1995). Evidence of "systematic unjust and unreasonable rates . . . [or] a pattern of such rates, that demonstrates the inability of the commercial mobile radio service marketplace to produce reasonable rates through competitive forces" is such an example. *See* 47 C.F.R. § 20.13(a)(2)(vii). In contrast, Cellnet's complaint alleges only that GTE Mobilnet and New Par charges Cellnet at discriminatory rates. It does not allege "systematic" unjust rates.

Indeed, before the district court, GTE Mobilnet and New Par commented on the impact of Cellnet's complaint on Ohio's investigation necessary for Ohio to assess whether to ask for authority to re-regulate under subsection (i). They conceded that "In the Cellnet Complaint proceeding, the [Commission] will not gather the information it needs to evaluate an industry . . . . The objective of the Cellnet Complaint is not to determine if market conditions are adequately protecting all subscribers; the objective of the Cellnet Complaint is to regulate the rates charged to Cellnet." In its brief before this court New Par continues to make this argument. Thus, GTE Mobilnet and New Par agree that Cellnet's complaint was not intended to pursue the type of relief contemplated by subsection (i). Only the district court employed this interpretation of this provision.

In August 1994, Ohio filed a petition before the FCC to preserve its right to re-regulate rates under section 332(c), which the FCC denied. The FCC stated: "Unlike some of the opponents of the [Ohio] Petition, we do not view the statutory preference for market forces rather than regulation in absolute terms. If Congress had desired to foreclose state and federal regulation of [mobile service providers] entirely, it could have done so easily." *In the Matter of Petition of the State of Ohio for Authority to Continue to Regulate Commercial Mobile Radio Services,* 10 F.C.C. R. 7842, 7844 (1995). The

FCC continued, stating that though Ohio could not fix rates,

> it does not follow that its complaint authority under State law is entirely circumscribed. Complaint proceedings may concern carrier practices, separate and apart from their rates.... We view the statutory "other terms and conditions" language as sufficiently flexible to permit Ohio to continue to conduct proceedings on complaints concerning such matters.... We conclude, therefore, that Ohio's review of contractual agreements between two or more [commercial mobile radio services] providers, including interconnection agreements and roaming agreements entered into by ... providers, also falls within the "other terms and conditions" language of section 332(c)(3) to the extent that such review does not directly affect end-user rates. Moreover, nothing in [the Act] indicates that Congress intended to circumscribe a state's traditional authority to monitor commercial activities within its borders. Put another way, we believe Ohio retains whatever authority it possesses under state law to monitor the structure, conduct, and performance of ... providers in that state.

*Id.* at 7852–53. (footnotes omitted). The FCC believed that Ohio retained whatever authority state law provided to regulate the conduct of mobile service providers within that state. We emphasize, however, that in reaching its decision, the FCC did not rule on the preemption question, since the FCC stated that the record was not sufficiently detailed to allow it to "comment meaningfully" on the regulatory activities contemplated by the Commission in the Cellnet proceedings. We cite the FCC decision only to demonstrate that the preemption issue is complex, and that the statute does not present a facially conclusive claim of preemption.

In sum, we reject the district court's conclusion that the plain language of subsection (i) reflects Congress's clear intent to preempt the states' authority to control discriminatory rates. Subsection (i), on its face, seems to require widespread breakdown of the competitive market for states to get authority to re-regulate rates, and does not seem to suggest that states may no longer adjudicate individual cases of anti-competitive or discriminatory misconduct. The question of whether federal law preempts state law in this case is complex, but there is no need for us to delve further into it because our precedent instructs that we need only determine whether "facially conclusive" claims of preemption are present. We therefore hold that on its face subsection (i) does not present a "facially conclusive" claim of preemption of the Commission's authority to hear this complaint.[14]

## II.

Because we conclude that this sort of regulation by the states is not facially preempted by section 332, *Bunning* and *Norfolk* do not require us to ignore abstention arguments; instead, we look to *CSXT* and *Federal Express* for guidance.

In *CSXT*, we held that a court should consider two questions; the first being whether the state court has concurrent jurisdiction to decide a preemption issue. 883 F.2d at 473–74. We determined that state courts normally have concurrent jurisdiction over federal issues unless the relevant statute specifies otherwise. *Id.* at 472. Here, there is no indication in the statute that the state court does not have concurrent jurisdiction to decide the preemption question.

We now turn to the second question posed by *CSXT*: whether we should abstain in favor of the ongoing state proceedings under the principles of *Younger*. "Fed-

---

**14.** GTE Mobilnet cross-appeals arguing that the district court erred in allowing the Commission to retain jurisdiction over the issues in the complaint relating to bundling. The district court correctly observed that the legislative history specifically provides that bundling falls into the category of "other terms and conditions" reserved to the states. Because the answer to this preemption issue is facially conclusive in light of this legislative history that expressly allows the states to regulate bundling, there was no need for the district court to abstain on this preemption question. *See Bunning,* 42 F.3d at 1011–12; *Norfolk,* 926 F.2d at 573. The district court correctly allowed the Commission to retain jurisdiction of these issues. We therefore reject GTE Mobilnet's argument and affirm the judgment of the district court on this issue.

eral courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism." *Quackenbush v. Allstate Insurance Co.,* —— U.S. ——, ——, 116 S.Ct. 1712, 1724, 135 L.Ed.2d 1 (1996). In *Younger,* the Supreme Court determined that federal courts should not enjoin pending state criminal proceedings started before the filing of a federal suit, except in the unusual situation where an injunction is necessary to prevent immediate and irreparable injury. 401 U.S. at 46, 91 S.Ct. at 751–52. Three requirements have developed for proper application of the *Younger* doctrine: "(1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges." *Sun Refining Marketing Co. v. Brennan,* 921 F.2d 635, 639 (6th Cir.1990); *see Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). We review the district court's abstention analysis de novo. *See Federal Express,* 925 F.2d at 967.

There is no question that the Commission actively was adjudicating Cellnet's complaint when GTE Mobilnet and New Par filed this federal court action. Immediately before GTE Mobilnet and New Par filed their complaint in federal court, the Commission had issued an order requiring the parties to move forward with discovery. We thus conclude that ongoing proceedings existed at the time GTE Mobilnet and New Par filed this action in district court.

Whether "an administrative agency's proceeding will be characterized as judicial or legislative depend[s] on the 'nature of the final act' which it is designed to produce." *Sun Refining,* 921 F.2d at 640 (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 371, 109 S.Ct. 2506, 2519–20, 105 L.Ed.2d 298 (1989) ("*NOPSI* ")). In *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), the Supreme Court explained:

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws sup-

posed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative and not judicial in kind....

*Id.* at 226, 29 S.Ct. at 69. The Supreme Court decided that the question before the agency was whether a certain rule should be made, and thus concluded that the proceedings were legislative rather than judicial in nature. *Id.* at 229, 29 S.Ct. at 70–71. The Supreme Court, in *NOPSI,* recently reaffirmed *Prentis*'s analysis and held that an action brought by a utility for a rate increase was legislative in nature and thus refused to abstain under the principles of *Younger.* 491 U.S. at 371–73, 109 S.Ct. at 2519–21.

Cellnet's complaint concentrates on matters that allegedly occurred before the filing of the complaint. It will require the Commission to consider many factors, including the past and current practices of the telephone companies with respect to their wholesale and retail operations that allegedly violate Ohio's statutory scheme designed to prohibit discriminatory and unjustly preferential practices of public utilities. Cellnet's requests for relief include asking the Commission: (1) to find that GTE Mobilnet and New Par violated the Ohio laws at issue; (2) to order GTE Mobilnet and New Par to comply with these laws; and (3) to hold GTE Mobilnet and New Par liable for damages suffered as a result of the violations of Ohio law. Because the complaint before the Commission asks for a declaration of Cellnet's rights against GTE Mobilnet and New Par "on present or past facts and under laws supposed already to exist" instead of requesting "the making of a rule for the future", we hold that the proceedings before the Commission are judicial in nature. *See id.* at 372, 109 S.Ct. at 2520–21.

In *NOPSI,* the Supreme Court acknowledged that "[t]he regulation of utilities is one of the most important of the functions traditionally associated with the police pow-

er of the States." 491 U.S. at 365, 109 S.Ct. at 2517. The Court instructed that when considering the "substantiality of a State's interest in its proceedings we do not look narrowly to its interest in the *outcome* of a particular case ... [but to] the importance of the generic proceedings to the State." *Id.; see Sun Refining,* 921 F.2d at 641. Thus the appropriate question here is not whether Ohio has a substantial interest in GTE Mobilnet's and New Par's conduct, but whether it has a substantial, legitimate interest in regulating commercial mobile service providers and in prohibiting anti-competitive conduct by such providers. In light of *NOPSI*'s holding that the regulation of utilities · is an important function of the states, we hold that Ohio has a substantial, legitimate interest in the proceedings at issue here.

 Finally, we must consider whether the state proceedings afford an adequate opportunity to raise constitutional claims. *See Middlesex,* 457 U.S. at 431–32, 102 S.Ct. at 2520–21. Even where constitutional claims may not be brought in state administrative proceedings, the third element of *Younger* is satisfied where the constitutional claims can be heard·during state court judicial review of the administrative proceedings. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 629, 106 S.Ct. 2718, 2723–24, 91 L.Ed.2d 512 (1986); *accord see, e.g., Sun Refining,* 921 F.2d at 641; *CSXT,* 883 F.2d at 474; *Watts v. Burkhart,* 854 F.2d 839, 848 (6th Cir.1988). Judicial review of a final Commission order can be obtained in the form of a direct appeal to the Supreme Court of Ohio. *See* Ohio Rev.Code Ann. § 4903.13 (Banks–Baldwin 1994). We conclude that GTE Mobilnet and New Par will have an adequate opportunity to raise their federal preemption claims in the state proceedings.

Accordingly, the Commission and Cellnet have satisfied every requirement for the proper application of *Younger* abstention. We therefore hold that the district court should have·abstained from consideration of GTE Mobilnet's and New Par's motion for relief.

·Having decided the case on *Younger* abstention, we need not consider the arguments based on *Pullman* abstention or the remaining issues raised by the parties.

We affirm the district court's judgment on the bundling issue and reverse the judgment in all other respects. We remand this case to the district court with directions to ·dissolve the preliminary injunction against the Commission and to dismiss the case. The Commission must be allowed to resolve this preemption question.